J-A18012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: I.C., A/K/A I.M.C., A MINOR CHILD | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : : | |
| APPEAL OF: T.C., FATHER | : : : | |
| | : : : | |
| | : | No. 331 WDA 2021 |

Appeal from the Order Entered February 5, 2021
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-20-0643

BEFORE: OLSON, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:               **FILED: September 20, 2021**

Father, T.C., appeals the trial court order, dated February 4, 2021, and entered on February 5, 2021, that granted the petition filed by the Washington County Children and Youth Social Services Agency ("WCCYS" or the "Agency") and involuntarily terminated his parental rights to his minor, male child, I.C., a/k/a I.M.C., ("Child") (born in April 2019), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(2), (5), and (b).[1]  We affirm.

_____

[1] In a separate order dated February 4, 2021, and entered on February 5, 2021, the trial court also involuntarily terminated the parental rights of Child's mother, S.W. ("Mother"), pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b).  Further, on February 5, 2021, the trial court set forth its reasoning for terminating the parental rights of Father and Mother.  The trial court noted that Mother failed to appear at the hearing, and she did not present any evidence.  Order of Court, 2/5/21, at 1.  Father appeared at the hearing.  *Id.* He presented testimony and argument to counter the Agency's petition, but the trial court found in favor of the Agency.  *Id.*  Mother has not filed an appeal

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the factual background and procedural history of this appeal as follows:

[Child] was born [in April 2019], to [Mother] and [Father]. At the time of [Child's] birth, [Mother] and [Father] were described as having an "on again, off again relationship."

On June 20, 2019, [Mother] reported ongoing domestic violence concerns indicating that, "[Father] came to her residence and choked her and has threatened to kill her and the family that resides in the home." *Shelter Care Application of [the Agency], filed June 25, 2019.* According to the same petition, "[Mother] requested that the children be picked up by the foster parents on June 22, 2019, due to [Father] continuing to make threats." *Id.* Resultant of said allegations, on June 24, 2019, the Honorable Michael J. Lucas entered an Emergency Shelter Order. A hearing followed and on June 27, 2019, the Shelter Order was confirmed before Juvenile Hearing Officer Gina Ziady.

The Shelter Order, adopted by the Honorable Michael Lucas, specifically describes allegations of domestic violence and concern for the [Child], in addition to two (2) other children. In addition, the Shelter Order discusses a temporary Protection from Abuse Order (hereinafter "PFA") that was obtained by [Mother] and against [Father]. *See* Shelter Order of July 3, 2019. Importantly, the Shelter Order notes:

[Mother's] question to the caseworker regarding whether WCCYS would remove [Child] from her care if she obtained a PFA against [Father] indicates to the court [Mother] was cognizant of the court's concern regarding contact with [Father] due to domestic violence. [Mother] admitted to being [choked] by [Father] in April 2019[,] which was either immediately prior to or after the birth of [Child] on April [], 2019. After being [choked], [Mother] allowed [Father] access to [Ms. A.'s] home[1] on at least three other occasions to visit with [Child] after the choking incident.

_____

from the order terminating her parental rights to Child, nor has she filed a brief in Father's appeal.

*See* *Shelter Care Order.* The Order continues by noting:

> Although [Mother] obtained a temporary PFA against [Father] to protect her and [Child], [Mother] is currently not in mental health treatment, [or] domestic violence counseling, and has not resumed medication management. [Mother] testified she will follow through with obtaining a final PFA against [Father,] which she has failed to do in the past. At this time, [Mother] has not demonstrated to the court she possesses the insight or skills needed to ensure [Child's] safety on an ongoing basis.

*See* *Shelter Care Order.* [Father] was present at the Shelter Hearing and was ordered to: participate in paternity testing, complete domestic violence offender counseling, maintain safe and stable housing, participate in anger management counseling, and complete a mental health assessment. *Id.* Father was not granted visitation due to the outstanding PFA Order.

_____

[1] Location where [Mother] was residing with [Child] and her other minor children, with which she had an open Agency case. A [c]ourt order prevented [Mother] from allowing physical contact between her other two (2) children and [Father].

Trial Court Opinion, 4/5/21, at 4-6 (footnote in original).

The trial court set forth the factual and procedural background of the dependency proceedings that gave rise to this appeal as follows.

> Following the Shelter proceedings, on July 2 and 3, 2019, the Agency filed a Dependency Petition for which a hearing was conducted. By Order dated July 22, 2019, [Child] was adjudicated a dependent child and the recommendations from the Shelter Order for [Father] were incorporated. All parties agreed to the adjudication and the [trial court] ordered [Mother's] address be withheld from all court and agency documents due to "domestic violence concerns."
>
> A permanency review hearing was held on November 1, 2019, wherein [Father] was found to have had moderate progress with the permanency plan and [minimal] progress towards

alleviating the circumstances necessitating placement. [Father] was granted supervised visitation with [Child] and was again ordered to: complete domestic violence offender counseling, maintain safe and stable housing, participate in anger management and complete an individual psychological evaluation. The Order notes that, "despite [Mother's] prior assurances to the court that she would obtain a final PFA against [Father], [Mother] did not appear for the final PFA hearing." The Order noted that,

> [Father] "is not engaged in parenting education, mental health treatment, anger management counseling, or domestic violence offender counseling." On a positive note, the Order detailed that "[Father] exercises regular supervised visitation with [Child]. He is engaged in visitation coaching and is receptive to redirection. [Father] resides out-of-state. He reports having difficulty accessing services due to health insurance issues. All parties agreed parenting education and anger management counseling will be provided to [Father] by JusticeWorks YouthCare prior to and after visitation with [Child].["]

*November 1, 2019 Permanency Review Order.*

Trial Court Opinion, 4/5/21, at 6-7 (emphasis in original).

The trial court set forth the factual and procedural background of the additional permanency review hearings in the dependency proceedings as follows.

> On March 10, 2020, a permanency review hearing was held wherein [Father] was found to have minimal compliance with the permanency plan. It was noted that [F]ather enrolled in Batterer's Intervention, but had not completed this or other services during the review period. The Order also reflects that "Father has been in Mississippi since December 2019 taking care of his ailing father, who has since passed away. Father remains in Mississippi to handle [his] deceased father's settlement of estate. Father contacted the [A]gency requesting that his services and visitation be suspended during this time." *March 10, 2020 Permanency Review Order*. The Order incorporated past mandates that [Father] complete domestic violence offender counseling, maintain safe and stable housing, participate in anger

management and complete [an] individual, psychological evaluation. *Id.*

Trial Court Opinion, 4/5/21, at 7 (emphasis in original).

On June 16, 2020, the Agency filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b). The trial court set forth the factual and procedural background of the dependency proceedings and the additional permanency review hearings as follows.

> The next permanency review hearing was on July 21, 2020, wherein [Father] was found to be minimally compliant with the permanency plan. The Order specifically notes that Father only obtained appointments, mandated by the [c]ourt's prior Orders, the day prior to the review hearing. The Order reflects that [F]ather failed to visit with [Child] during the review period and failed to take advantage of video visitation. In response, [Father] indicated that he "didn't receive calls" from JusticeWorks, despite testimony to the contrary from an Agency representative. In addition, Father said he "believed visits could not happen due to COVID 19 restrictions" and was unaware that video visitation was possible. The Order notes that [Father] also missed a visit that was scheduled immediately prior to the review hearing. Father's required services remained the same as previously [o]rdered. *July 21, 2020 Permanency Review Order.*

> On August 31, 2020, [Father] motioned the [c]ourt for increased visitation with [Child]. The request was denied, without prejudice, requiring [Father to] complete the previously[-] ordered interactional evaluation.

> A permanency review hearing was held on October 10, 2020, wherein Father was found to have minimal compliance with the permanency plan and no progress in alleviating the circumstances which necessitated the original placement. At this time, [Child] was out of [Father's] care in excess of [15] months[,] and the Agency [had] filed a petition for termination of parental rights. The Order of October 10 details:

Although Father has begun and completed one court ordered service, the Agency remains concerned with his progress in the present matter. Of significance, the Agency is concerned with Father's inconsistent visits, continued need for re-direction during visits, and delay in Father's commencement and completion of court ordered services. The [c]ourt has notable concern that in the beginning and participating with services and in his evaluation with Dr. [Terry] O'Hara, [F]ather described his activity as "jumping through hoops" and fails to recognize the need and/or importance of the service. Father's physical residence has changed significantly throughout the history of the case. Notably, [F]ather was out of state for several months at the beginning of 2020, attending to his sick father and[,] following his [father's] passing, attending to activities involved with the same. Father now resides in West Virginia, which has been confirmed as of . . . November 6, 2020.[2] Father attended 11 visits of the 16 offered. Blueprints, who supervises visits, remains concerned with [F]ather requiring regular re-direction, and direction to feed [Child]. [Child] has been in foster care for 17 months. His foster father reports that he is doing well and he was observed on TEAMS screen appearing comfortable and happy. When sensitive discussion was anticipated, foster father was asked to have [Child] leave the room. . . . . . Father was offered TPR [termination of parental rights] counseling but declined. The original date of the TPR was continued due to Dr. O'Hara recommending time to provide Father with an opportunity to complete services and interact with [Child] in light of the time Father spent caring for his own father. However, Dr. O'Hara noted specific concerns with Father's lack of time with his son and his son's need for consistency; allegations of domestic violence against [F]ather; and Father's 'less than serious' attitude about services.'

*October 10, 2020 Permanency Review Order.*

---

[2] It was later determined that the only confirmation of address was through Father's self-reporting. Later efforts to locate Father at stated address proved fruitless and Father failed and refused to provide the address of the location where he was residing.

Trial Court Opinion, 4/5/21, at 7-9 (footnote in original).

The trial court continued to set forth the factual and procedural background of the dependency proceedings and the additional permanency review hearings as follows.

> On December 23, 2020, [Father] again motioned the [c]ourt for expanded visitation. In support of his request, Father argued that he: "completed anger management, started parenting education, continued to participate in domestic violence counseling, and continued to participate in visitation." Having no verifiable address for [Father], said request was denied.

> The final permanency review before hearing on the TPR petition was held on January 19, 2021. During this hearing, [Father] was found to be in substantial compliance with the permanency plan with no progress toward alleviating the circumstances which necessitated the original placement. Testimony was provided at the hearing that [Father] completed his [c]ourt[-]ordered services and did "much better" with his interactional evaluation with his son than previously. Although Dr. O'Hara, who completed the evaluation, preliminarily stated that [Father] was "no risk of harm or violence," after examination regarding known problems with [Mother's] veracity, Dr. O'Hara agreed he had concerns with the information provided by [Father], which formed the bases of his ultimate opinion.[3]

> Testimony of [Father's] [B]atterer's [I]ntervention [C]ounselor, Katherine ["Kate"] Bozar, indicated that [Father] did not immediately attend therapy and engaged in a series of self-imposed stops and starts throughout his treatment. [Father] ultimately completed [b]atterer's intervention on January 13, 2021. Bozar described [Father] as "extremely guarded." The [trial court] recognized the same noting, "The [c]ourt was able to observe [Father's] guarded behavior first[-]hand in his response and/or lack thereof to questions [during] his testimony. [Father] was directed to respond to several questions, directly refused to respond to many others and provided overall elusive responses to questioning[,] [i.e.,] Where do you work .... "My job"; Where do you live .... "I don't know right now."

As a result of the testimony elicited at the January 2021 hearing, the [c]ourt ordered the following:

Within 72 hours, [Father] shall provide the Agency with the address where he is presently residing and execute releases necessary for the Agency to obtain verifiable information regarding his present employment. The Agency shall further investigate the home [Father] lists as his permanent address, [  ], Shubuta, Mississippi, 39360, to verify [Father's] ownership of said property and to determine, at least preliminarily, if such address provides potential as safe, suitable and adequate housing for [Child.]

*Permanency Review Order of January 19, 2021.* Father was also granted extended time for his next supervised visit with [Child].

_____

[3] Dr. O'Hara acknowledged that he was unaware if [Father] was working or where [Father] was currently living. [Dr.] O'Hara was also unaware if visit coaching was still needed (as testified to by provider) or if [Father] had a criminal record documented outside of the Commonwealth of Pennsylvania.

Trial Court Opinion, 4/5/21, at 9-10 (footnote in original).

The trial court continued to set forth the factual and procedural background of the dependency proceedings and the additional permanency review hearings as follows.

On January 26, 2021, the Agency filed a Status Report regarding the additional [c]ourt requests. *See Attachment "A" Status Report at DP 69-19, attached hereto and made a part herein*. Of particular significance[,] the status report, which went unchallenged, noted the following:

[Father] had a three[-]hour long visitation on January 22, 2021, at the Agency. [Father's] visitation was supervised by Caseworker Eisengart. [Father] arrived five minutes late for visitation with [Child]. [Father] brought items with him for the visitation which included: a bag of diapers, wipes, juice, snacks, and lunch for [Child].

Initially, Caseworker Eisengart had to tell [F]ather to take [Child's] coat off at the beginning of their visit. [Father] played with [Child] and checked his diaper without prompting. [Father] did put [Child's] diaper on backwards but realized it was on backwards, and switched the diaper around. [Father] also fed [Child] lunch without being prompted to do so.

Following [Father's] visitation on January 22, 2021, the Agency caseworker who was supervising the visit had [Father] sign releases to [Company 1] as well as the Laborers Union 1149.[4]

During the visitation, [Father] did not provide the caseworker an address for where he is residing.

The Agency spoke with staff at the [Laborers] Union 1149 on January 25, 2021. Staff reported that according to their records, [Father] has been active with the union since May 18, 2018. [Father] was employed with a [different] company, [Company 2], from June 4, 2018 until July 13, 2018. [Father] was then employed with another company from July 18, 2018 until December 3, 2018 through a company called [Company 3]. Staff reported that [Father] was employed at [Company 1] from July 22, 2019 until November 15, 2019. [Father] has been on the unemployed list since July 22, 2019.

The Agency reached out [to Company 2] on January 25, 2021. They reported that [Father] has not worked for their company since December 2019. Staff were unable to say if [Father] was terminated or quit[;] however, [they] indicated he was no longer employed with their company.

At the last hearing, [Father] reported that his residence is [], Shubuta, MS 39360. According to the property information, the property shows as vacant. The home is currently owned by Mr. [J.C.,] but it shows it was redeemed by [Father] on February 14, 2020.

*Status Report of January 26, 2021*.[5]

---

[4] Location that [Father] indicated he worked at prior hearing.

⁵ [Father] later informed the [c]ourt that a trailer is located on the property.

Trial Court Opinion, 4/5/21, at 10-11 (footnotes in original).

On January 28, 2021, the trial court held an evidentiary hearing on the termination petition.[2] At the hearing, the Agency presented the testimony of Agency caseworker, Deanna Bevan; and Father's Batterer's Intervention Counselor, Kate Vozar. N.T., 1/28/21, at 9, 66-68. Father testified on his own behalf, and presented the testimony of Dr. Terry O'Hara, Ph.D., who testified as an expert in child psychology. *Id.* at 89, 104-105. The trial court made the following findings of fact from the testimony of Ms. Deanna Bevan.

> During the TPR hearing, Agency caseworker, Deanna Bevan[,] provided testimony regarding the history of placement, compliance and progress in the Dependency Court case. Ms. Bevan testified that, at the initial time of removal, [Father's] whereabouts were not immediately known and a temporary protection from abuse was in place that precluded contact between [Father] and [Child]. Specific to the mandated services for Father, [Ms.] Bevan testified that Father completed domestic violence counseling in January of 2021, completed anger management in November of 2020, and engaged in individual and interactional evaluations. [Ms.] Bevan testified that Father had provided no proof of safe and stable housing and remained in parenting counseling, having not completed services with JusticeWorks Youthcare (JWYC). Further testimony established that, although Father had completed domestic violence counseling, concerns lingered due to Father failing to be fully engaged in his treatment. Further, [Ms.] Bevan testified that despite his active involvement with JWYC, Father continues to require direction with very basic care of [Child].

---

[2] Attorney Erin W. Dickerson represented Child as his legal interest counsel/guardian *ad litem* at the hearing. On May 28, 2021, Attorney Dickerson filed a brief on behalf of Child in this appeal.

[Ms.] Bevan was specifically questioned about Father's compliance regarding providing information about his present address and employment. [Ms.] Bevan stated that Father failed to provide a valid address, citing mail returns, an inability to locate addresses provided, and property searches providing inconsistent data to that provided by [Father]. Citing Father's January 19, 2021 testimony, [Ms.] Bevan said she was unable to confirm Father's housing and/or employment. In fact, [Ms.] Bevan testified she was unable to verify any employment for Father after November of 2019, a specific contradiction from the information [Father] provided the Agency and the Court.

[Ms.] Bevan testified that Father's visits were suspended when [] Child was first adjudicated, due to the PFA. Father was then granted supervised visits, but he first stopped attending and then requested a hold on visits as of March 10, 2020.[6] Father did not resume visits until July[] 2020 and had no contact during the time span of January 5, 2020 through July 16, 2020, with the exception of a video sent to [Child] for his birthday. Father has never obtained unsupervised visits and [Child] remains in an undisclosed foster home, where he has resided since his removal in June [] 2019.

Caseworker Bevan testified that [Child] is extremely bonded to his foster parents and calls them mom and dad. There is one other child in the foster home[,] and [] Child has a sibling relationship. [Child's] daily needs, developmental needs, and medical needs are met by the foster parents. In contrast, [Child] has never been returned to the care of the biological parents. Furthermore, to this date, Father has been unable to establish safe and stable housing, has not completed parenting counseling and education, and has not been upfront with his providers. Ms. Bevan testified that [Father] was not truthful with the Agency[,] and cited his misinformation regarding his housing and employment.

In summary, [Ms.] Bevan testified that she believes it is in the best interest of [Child] to have the TPR granted and for his adoption by the foster family. In support of her position, [Ms.] Bevan listed: [Child] has been in care 19 months; he has consistency with the foster family and has bonded; concerns remain about [Father's] truthfulness about his employment and residence, including his failure to even tell the Agency with whom he resides; Father's continued requirement of supervised visitation and parenting counseling; and Father's failure to

- 11 -

acknowledge that he cannot put parenting on hold for a seven[-]month period.[7]

[Ms.] Bevan testified that[,] after [Child] visits with Father, [] Child doesn't cry or appear impacted by the separation. Father has never attended a doctor's visit for [] Child and hasn't requested attendance and cannot meet the essential needs of [Child].

_____

[6] The time frame [Father] indicated that he was attending to his ailing [f]ather out of state.

[7] [Ms.] Bevan was asked whether Father made attempts to reach her or [Child] during the seven[-]month period. [Ms.] Bevan testified that Father never contacted her[,] and she would reach out to communicate with Father and would hear no response. [Ms.] Bevan further testified that Father never requested services in Mississippi, including telehealth and/or video visitation.

Trial Court Opinion, 4/5/21, at 12-14 (footnote in original).

The trial court made the following findings of fact from the testimony of

Ms. Kate Vozar.

The next witness at the TPR hearing was [Father's] Batterer's Intervention Counselor, Kate Vozar. Ms. Vozar testified that she initially received a referral for services for Father in November [] 2019. [Father] was a no show for his first intake on December 18[, 2019,] and ultimately had intake on December 23, 2019. [Ms.] Vozar testified that Father did not attend regularly and then was absent for a period of [seven] months, specifically noting that in March [] 2020 services switched to on-line due to the pandemic and [Father] still failed to attend.[8] [Ms.] Vozar testified that Father re-started services two months prior to the TPR hearing and had no absences in the last referral period.

[Ms.] Vozar described [Father] as "very guarded" and noted that[,] while he did well "academically," he did not report any issues. [Ms.] Vozar found this remarkable saying, even if they deny the actions, generally they will acknowledge things they can do better. [Father] denied and said he was just engaged in the services for CYS. [Ms.] Vozar felt that [Father] was just going

through the motions without processing any of the information provided in the curriculum. [Father] was also guarded with [Ms.] Vozar regarding his living arrangements telling her, "I live with friends."

_____

[8] On cross[-]examination, [Ms.] Vozar stated that in communication with [Father,] he informed her he was having log in problems, but he never reached out to [Ms.] Vozar with assistance in rectifying such issues.

Trial Court Opinion, 4/5/21, at 14 (footnote in original).

The trial court made the following findings of fact from the testimony of

Father.

Next, [Father] provided testimony on his own behalf. [Father] testified that he didn't visit [Child] at the beginning of the case because paternity was not established. [Father] acknowledged that he began domestic violence counseling in December [] 2019, but "flew out" and got home on December 28, 2019. [Father] indicated that he found his father on the floor and stayed and cared for his father until his [father's] passing on February 2, 2020. [Father] testified that, following his father's passing, he had a number of responsibilities, including: administering his father'[s] estate, his father's burial, payment of his [father's] past debt, and direction of "who got what share of his estate." He testified that this process took approximately three months, but then there was a travel ban due to COVID-19. [Father] testified that he started services upon his return to Pennsylvania. In contrast to the Agency testimony, Father testified that he continued contact with [WC]CYS during his absence and was told that visitation was shut down. [Father] testified, "every so often, I called[,] and me and my mother sent a video on April 16, 2020." [Father] testified that[,] since June [] 2019, he has been engaged with services, except when he had a conflict with his work schedule. [Father] testified that he works around [40] hours a week, Monday through Friday, but noted that it was difficult working in 2020 due to the pandemic, so he had to resort to "side work."[9] Father testified that the Union was lying to the Agency when they reported that he had not been employed since 2019. [Father] testified that [Ms.] Vozar was lying about informing him of telehealth and alternate services. [Father]

- 13 -

suggested the caseworker was untruthful testifying about video visits, testifying that[,] when he requested phone conversations with his son, he was told he could just send a video.

Regarding his residence, [Father] testified that he has a home [] in Shabuta, Mississippi. When asked if such property was vacant, [Father] indicated that there was a trailer on the property. Finally, [Father] testified that he loves his child and wishes to be reunified with him.

_____

[9] [Father] declined to say what side work [he performed] and for whom. When pushed on cross-examination, Father said he did a "side roofing job." When further pressed, Father[,] for the first time of record[,] indicated he did side roofing with close relatives during the summertime, specifically a [Mr. L.T.] with [Company 3,] a complete contradiction to the testimony [he] provided to the [c]ourt during the final permanency review hearing.

Trial Court Opinion, 4/5/21, at 15-16 (footnote in original).

The trial court made the following findings of fact from the testimony of

Dr. Terry O'Hara.

Being called as a witness for Father, Dr. Terry O'Hara testified as a Child Psychology Expert. Dr. O'Hara testified that he conducted an evaluation of [Father] and [Child]. [Dr.] O'Hara noted that he saw several positive indicators, including Father's involvement with JWYC, anger management, visit counseling, and [B]atterer's [I]ntervention counseling. [Dr.] O'Hara testified that the information provided to him was by [Father]. [Dr.] O'Hara testified that [Father] denied a lack of independent housing.

Dr. O'Hara testified that [Father] did well during the interactional evaluation and showed several positive parenting skills, an improvement from his first evaluation with Father. [Dr.] O'Hara noted that he had no information regarding negative parenting from visitation and further noted his concerns over the validity of the allegations of domestic violence.[10] [Dr.] O'Hara opined that, given [Father's] progress, visitation with [Child] should increase[,] and further noted that[,] if [Father] displays positive parenting skills, it would increase his bond with [Child].

- 14 -

When questioned by [Father's] attorney regarding a bond, [Dr.] O'Hara testified that he thinks there is a bond and noted that [Father] clearly cares for his son and "shows great parenting skills."[11] As an aside, [Dr.] O'Hara noted that children with a biological family tend to do better.

On cross[-]examination, Dr. O'Hara acknowledged the lengthy time [Child] had been in placement and without permanency. Dr. O'Hara testified that he felt there were extenuating circumstances in the present case that contributed to the lack of contact. [Dr.] O'Hara testified that, "given his (Father's) gains, he should be given more time to demonstrate minimally adequate parenting." Dr. O'Hara was also cross-examined regarding the inconsistent and misleading housing and employment information provided by [Father] to the Agency. In review, Dr. O'Hara noted that the information was inconsistent with the information provided to him by [Father] and caused concern over [Father's] overall veracity. Specifically, Dr. O'Hara said, "if Father is untruthful about this, it makes me wonder what other things is he prevaricating [about,] and calls into [question the] credibility [of] all aspects of the evaluation." Dr. O'Hara further testified that[,] despite Father's excuses for his seven[-]month absence, such excuses are not a reason to avoid parenting, admitting [Father] could have been more vigilant about his son. Further, [Dr.] O'Hara acknowledged that testimony from Chris Yeardie indicating that Father continues to need visit counseling was "concerning," but noted that he "needs more context."

_____

[10] When cross-examined about this thought[,] Dr. O'Hara acknowledged his limited information.

[11] This statement was later clarified by Dr. O'Hara[,] noting that his observation was that of Father's bond to [C]hild and not Child's bond to Father. [Dr.] O'Hara felt Child would have increased bonding with additional visitation time.

Trial Court Opinion, 4/5/21, at 16-17 (footnotes in original).

On February 5, 2021, the trial court entered the order terminating

Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and

(b). On March 8, 2021, Father timely filed a notice of appeal, along with a concise statement of errors complained of pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

In his brief on appeal, Father raises two issues:

1. Did the trial court err in terminating Father's parental rights as evidence presented did not meet the burden of clear and convincing evidence under 23 Pa.C.S. § (a)(2) [and] (5)[,] and 23 Pa.C.S. § 2511(b)?

2. Did the trial court err in denying Father's motion to dismiss the TPR [petition] after the Agency closed its case[-]in[-]chief without presenting clear and convincing evidence to terminate parental rights under 23 Pa.C.S. § (a)(2) [and] (5)[,] and 23 Pa.C.S. § 2511(b)?

Father's Brief, at 8.

In his brief, Father summarizes his argument as follows:

The trial court erred as a matter of law in granting the Agency's petition to terminate parental rights under [23 Pa.C.S.] § 2511(a)(2) [and] (5)[,] and 23 Pa.C.S. § 2511(b). The evidence was insufficient to sustain the burden of clear and convincing evidence. The Agency was completely lacking in meeting its burden[,] as Father has completed all court[-]ordered services except parenting. Father has always maintained he wished to reunify with his son. Additionally, after dealing with his [f]ather's death and administration of his [father's] estate[,] which was out[-]of[-]state, Father continued court[-]ordered services and completed nearly all of them. The COVID-19 pandemic also had an impact on Father's visits and services. The out[-]of[-]state travel ban implemented by nearly every state affected his ability to visit and engage in services. Washington County also suspended in[-]person visits for a period that began in March 2020[,] and [the suspension was] lifted around June 2020. The Agency cited no relevant concerns regarding parental incapacity or a relinquishment of a parental claim. The most relevant

_____

[3] **See** 1 Pa.C.S. § 1908 (regarding computation of time).

testimony came from expert[, Dr.] Terry O'Hara[,] who testified that Father exhibits several positive parenting indicators and no safety concerns with his parenting. He also testified that [C]hild has a beneficial relationship worth saving with [him,] and there is a clear bond between them. The Agency failed to produce evidence that [C]hild would suffer irreparable harm, and [it] could only state that [C]hild was in care for 19 months. The evidence does not support the concerns stated by the Agency regarding Father's lack of progress with services. To the contrary, the Agency's own witness, Kate Vozar, indicated progress in domestic violence counseling and completion of that service. Dr. O'Hara noted that there was a significant improvement in the relationship between Father and [C]hild between evaluations[,] and commended Father for his progress. Since there is a lack of clear and convincing evidence regarding the Agency's petition under section 2511, the trial court erred in granting the Agency's petition to terminate parental rights as to Father.

Father's Brief, at 23-24.

In reviewing the trial court order granting a petition to terminate parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

- 17 -

As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012); **see also In re S.K.L.R.**, 2021 Pa. LEXIS 3388, 2021 WL 3624786 (filed August 17, 2021) (reiterating the standard of review set forth in **R.J.T.** and **S.P.**).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.** quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See**

*In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will

address section 2511(a)(2) and (b), which provides as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party

must produce clear and convincing evidence regarding the following elements:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such

incapacity, abuse, neglect or refusal caused the child to be without essential

parental care, control or subsistence necessary for his physical or mental

well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In Matter of Adoption of C.A.W.*, 683 A.2d 911 (Pa. Super. 1996) *citing In re E.M.*, 533 Pa. 115, 120, 620 A.2d 481, 484, (1993); *In re William L.*, 477 Pa. 322, 345, 383 A.2d 1228, 1239 (1978).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A]

- 21 -

parent's basic constitutional right to the custody and rearing of . . . [his] child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121; *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007) (same). We have stated that a "child's life 'simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.'" *In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010); *In re Adoption of C.L.G.*, 956 A.2d at 1007 (same) *citing In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008).

In its Pa.R.A.P. 1925(a) opinion, the trial court provided the following analysis of Father's issues regarding section 2511(a)(2) and (b):

**SPECIFIC FINDINGS SUPPORTING DECISION:**

[Notwithstanding] his late participation in services, [Father] has yet to achieve a majority of the goals set forth for him by the Dependency Court. [Father] has not completed parenting counseling, has not obtained and maintained safe and stable housing, has not shown commitment, concern, or engagement with the services directed by the [trial court], and has failed to provide candid and accurate information to service providers, the Agency, and[,] most importantly this [c]ourt. [Father] refused, after a multitude of requests, to provide the Agency or this [c]ourt with his valid address, a verifiable location where he was staying, with whom he was staying, or any solid information related to his present living arrangements. Additionally, [Father] has provided

misleading and/or false information to the Agency and this [c]ourt relative to his employment and employment status. Further, although, in recent months[,] [Father] has taken some affirmative steps to maintain a relationship with his [c]hild and participate with services, he has voiced his disengagement indicating that he was only "going through the motions" or "jumping through hoops." This attitude is reflected through his participation in parenting education, wherein he participates but fails to progress[,] requiring continual coaching with items as basic as feeding and/or changing [ ] Child. [Father] has never achieved unsupervised visitation with [ ] [C]hild and[,] in 19 months, has not completed a [c]ourt-ordered parenting program. This [c]ourt is well[-]aware that "a parent who cannot or will not meet the irreducible minimum requirements set by the Juvenile Act within a reasonable time following state intervention may properly be considered 'unfit,' and may properly have parental rights terminated." *In re: J.W., A.W., V.W., and J.W.*, 578 A. 2d 952, 958, [sic] (Pa. Super. 1990). Moreover, failure of a parent to remedy the conditions within a reasonable period of time provides clear and convincing evidence that termination of parental rights of the parent(s) should occur. *In re: Adoption of B.J.R.*, 297 Pa. Super. 11, 15, 17, 579 A. 2d 906, 909, 913 (1990) [ ]; *In re: Adoption of M.A.R.*, 405 Pa. Super. 131, 191 A. 2d 1133 (1991).

This [c]ourt recognizes that [Father] had life circumstances that required him to care for his ailing father out[-]of[-] state and then attend to his father's estate. This [c]ourt further recognizes that restrictions were put in place as a result of the COVID 19 pandemic. But with that recognition, this [c]ourt also acknowledges that, as a result of pandemic restrictions, many services for which [Father] was mandated [to participate and complete] were available on-line and virtually, including visitation. Despite such offerings, [Father] failed and/or refused to take advantage [of the services]. And life difficulties cannot justify [Father's] lackadaisical response to services when he finally engaged. Finally, and most concerning to this [c]ourt, [Father] has provided misleading, partial and completely untruthful information to his service providers, to the Agency, and to this [c]ourt. Paraphrasing Dr. O'Hara, if he is not telling the truth about this, it makes you wonder with what else is he being dishonest [about,] and calls into question any conclusions [ ] reached based on information provided by [Father].

- 23 -

[Father] has never provided parental care for [ ] Child and has never attended – nor has he asked to attend – any of [ ] [C]hild's medical appointments or developmental evaluations. Notably, Father put parenting "on hold" for an extensive period of time, making no alternate arrangements for services, video visits or provisions for his [c]hild. "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." ***In Re: E.A.P.***[,] 944 A. 2d 79 (Pa. Super. 2008). A parent is required to make concerted, diligent efforts towards the reasonable prompt assumption of full parental responsibilities. A parent's vow to cooperate, and nothing more, after a long period of uncooperativeness regarding the necessity of and/or availability of services, may properly be rejected as untimely and disingenuous. ***In re: A.L.D.***, 797 A. 2d 326 (Pa. Super. 2002). "A parent does not perform his or her parental duties by displaying a merely passive interest in the development of the child." ***In re J.T.M.***[,] 193 A.3d 403 (Pa. Super. 2018).

Trial Court Opinion, 4/5/21, at 17-19.

With regard to section 2511(b), the trial court stated:

Finally, this [c]ourt must take into account whether a bond exists between the child and the parent; and if terminating the parental rights would destroy any existing, necessary and beneficial relationship or bond. [] 23 Pa.C.S. § 2511(b) is the second step in the analysis of considering termination of parental rights. As such, § 2511(b) requires "the court in terminating the rights of a parent [to] give primary consideration to the developmental, physical and emotional needs and welfare of the child." Section 2511(a) requires a focus on the parent when terminating parental rights, but § 2511(b) requires a focus on the child. ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). Section 2511(b) has been interpreted as a "best interests" and "bond" analysis.

To support its position under Section (b), the Agency asserts that, termination of parental rights best meets the needs and welfare of [ ] Child and termination of Father's rights will have no detrimental effect on the [m]inor child. Based on the testimony elicited at the hearing and a review of the relevant dependency case history, this [c]ourt agrees with this assertion. In the present

matter, [ ] Child has been in placement for well over 19 months. [ ] Child has been in his kinship foster home since he was two (2) months old, nearly his entire life. Father has never lived with [ ] Child and has never provided regular care for [ ] Child. Father still requires prompting in providing basic care of [ ] Child, necessitating supervised visitation. For the majority of [ ] Child's life, his foster parents have served the role of care givers and nurturers.

Here, [ ] [F]ather's own expert conceded during the hearing that the bond that [ ] [C]hild has with [ ] [F]ather is an attenuated bond. "The [c]ourt should consider the "importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful . . . the court must consider whether a natural parental bond exists between child and parent and whether termination would destroy an existing, necessary and beneficial relationship." *In the Interest of K.Z.S.*[,] 946 A. 2d 753 (Pa. Super. 2008). While this [c]ourt has no doubt that Father loves his [c]hild[,] this knowledge alone in insufficient to satisfy the requirements of § 2511(b). The [c]ourt believes that [ ] Child will benefit from a consistent and permanent resolution to his living situation and such benefit outweighs any limited bond that may exist with Father. Termination of the father's parental rights in the instant case best serves the developmental, physical and emotional needs of [ ] Child.

Accordingly, the opinion of this [c]ourt is the Agency has established through clear and convincing evidence, under § 2511(a) and (b), that termination of parental rights is in the best interests of [ ] Child, the Petition for Involuntary Termination was GRANTED, and such decision, respectfully, should not be disturbed on appeal.

Trial Court Opinion, 4/5/21, at 19-21.

In each of his three issues arguing that the trial court failed to consider the entire record, Father seeks for this Court to substitute our discretion for that of the trial court. We cannot do so. *See In re S.K.L.R.*, *supra*, *citing R.J.T.*, *supra*, in which our Supreme Court has instructed that we are not to substitute our discretion for that of the trial court. After a careful review, we

find that the trial court's determination that the Agency satisfied the requirements of section 2511(a)(2) and (b) is supported by competent, clear and convincing evidence in the entire record, which the trial court reviewed. *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27; *In re: T.S.M.*, 620 Pa. at 628-629, 71 A.3d at 267. As we perceive no error of law or abuse of the trial court's discretion, we find Father's issues lack merit, and we adopt the discussion set forth in the trial court opinion.

Finally, in his brief on appeal, Father asserts that the trial court erred in refusing to deny the Agency's termination petition, as his counsel requested at the close of the evidence at the hearing. *See* Father's Brief, at 34-35; N.T., 1/28/21, at 155-156. Father does not set forth any argument in support of this issue with citations to case law. Thus, he waived the issue. Nevertheless, we would find that it lacks merit, as we have concluded that there is sufficient evidence to support the trial court's termination of Father's parental rights under section 2511(a)(2) and (b). As such, the trial court did not abuse its discretion in refusing to deny the petition. Accordingly, we affirm the trial court order.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>9/20/2021</u>